UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------------x

J.B.,

                Plaintiff,

        -against-

UNITED STATES OF AMERICA, EUGENIO
PEREZ, JOSEPH NORWOOD, KIMBERLY
ASK-CARLSON, HERMAN QUAY, TOMAS
RODRIGUEZ, D'ANELLO SMITH, ANDY
CRUZ, JERMAINE DARDEN, OFFICER
GUAPA, and
JOHN/JANE DOES 1-10,

                Defendants.

----------------------------------------------------------------------x

Case No.

**COMPLAINT AND JURY
DEMAND**

Plaintiff J.B.[1], by and through her attorneys, Caitlin Robin & Associates

PLLC, for her Amended Complaint alleges as follows:

## NATURE OF THE ACTION

    1.    On September 2nd of 2016, while J.B. was an inmate at the Metropolitan

Detention Center ("MDC Brooklyn"), a federal detention center in Brooklyn, New York, she

was raped by a lieutenant at the facility, Defendant Eugenio Perez.

    2.    The horror that Perez inflicted on J.B. occurred only as a direct result of the

negligence and deliberate indifference of numerous federal officials.

---

[1] Plaintiff is using the initials "J.B." in this Complaint in place of her real name. It is necessary to
proceed pseudonymously for her privacy as a sexual assault victim. It is also necessary because
she fears that her name being disclosed publicly would result in violence against her or her
family members by individuals who forced her to participate in drug trafficking. Plaintiff notes
that federal prosecutors referred to her under a pseudonym in the indictments of Defendant
Perez, and that in the criminal proceedings of defendant Perez, the judge on this Court granted
the government's motions *in limine* and permitted J.B. to testify under a pseudonym during that
trials. *See United States v. Perez*, No. 17 Cr. 00280, ECF 81 at 3 n.1 (discussing sealed order,
ECF 75). On February 27, 2019, the Court granted Plaintiff's motion to proceed under her
initials.

3.      Defendant Perez used his position of power as a lieutenant to prey on J.B. because he understood they could do so with impunity. Perez chose J.B. as the victim of his repeated attacks because she was in particularly vulnerable circumstances: she spoke less than perfect English, received only 1 visitation in over 3 years at MDC, and was in a heightened emotional state because of the separation from her young children. Perez used both the lieutenant's office at the facility to sexually assault J.B., and the female inmate's bathroom, because he knew it was isolated during certain times of the week, and because they could monitor the security cameras from that office to ensure that no one came upon and observed them during the abuse.

4.      Perez was criminally convicted for sexually assaulting J.B. *See United States* v. *Perez*, 17 Cr. 00280 (E.D.N.Y.).

5.      Defendants were aware of the long history of prison officials at MDC Brooklyn sexually assaulting female inmates, which had resulted in multiple criminal convictions of MDC Brooklyn officials. Defendants were aware that MDC Brooklyn officials preyed upon female inmates in isolated areas of the facility. Defendants were aware of substantial problems with the policies, training, reporting systems, and oversight regarding sexual assault at MDC Brooklyn.

6.      In addition to J.B., Perez sexually assaulted at least five other female inmates at MDC Brooklyn.

7.      Defendants knew or should have known that Perez would sexually assault J.B. because individual defendants observed or should have observed the particular and unusual circumstances of how, when and where Perez insisted that J.B. specifically be the one to come to the lieutenant's office (which had no camera, but

which allowed someone inside to monitor who was approaching), at specific times/hours, for particular durations, and because they ensured they would be left alone with her.

8. Despite these obvious and open warning signs that J.B. faced a substantial risk of being sexually assaulted by Perez, Defendants took no action or steps to protect her or to intervene and stop the assaults, including without limitation by ensuring the implementation of policies or procedures to protect J.B. and/or to terminate, discipline, investigate, and/or otherwise supervise or manage Perez to ensure that each would not sexually assault J.B.

## JURISDICTION AND VENUE

9. This action arises under the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.*, the United States Constitution, *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and New York common law.

10. This Court has jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331, 1343(a), 1346(b), and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). This Court has jurisdiction over the supplemental state law claims pursuant to 28 U.S.C. § 1367.

11. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

12. Plaintiff submitted an Administrative Claim for the claims against the United States of America set forth below to the Federal Bureau of Prisons, which was received by the agency on June 14, 2018.

13. By letter dated February 6, 2019, the Federal Bureau of Prisons denied Plaintiff's Administrative Claim.

14. Accordingly, all conditions precedent to a Federal Tort Claims Act action in this court have been met.

## PARTIES

15.    Plaintiff J.B. is an individual who resides in Bronx County, New York.

16.    Defendant United States of America (the "United States") at all relevant times operated the Metropolitan Detention Center in Brooklyn, New York ("MDC Brooklyn"), and employed Defendant Eugenio Perez. Defendant United States is sued under the Federal Tort Claims Act for the wrongful and tortious acts of its employees and agencies.

17.    Defendant Eugenio Perez was employed by the United States at all relevant times as a Lieutenant at MDC Brooklyn. At all relevant times, Defendant Perez acted under color of federal law. Defendant Perez is sued in his individual capacity.

18.    Defendant Joseph Norwood was employed at all relevant times by the United States as the Regional Director, Northeast Region of the Federal Bureau of Prisons. In that role, he had responsibility for overseeing and supervising MDC Brooklyn. At all relevant times, Defendant Norwood acted under color of federal law. Defendant Norwood is sued in his individual capacity.

19.    Defendant Kimberly Ask-Carlson was employed by the United States as the Warden of MDC Brooklyn at times relevant to this lawsuit, beginning prior to J.B.'s incarceration there and until in or about December 2015. In that role, she had responsibility for overseeing and supervising the staff and female inmates at MDC Brooklyn. Defendant Ask-Carlson acted at all times under color of federal law. Defendant Ask-Carlson is sued in her individual capacity.

20.    Defendant Herman Quay was the Warden of MDC Brooklyn at times relevant to this lawsuit, from in or around December 2015 until after J.B. was transferred from MDC Brooklyn. In that role, he had responsibility for overseeing and supervising the staff and female inmates at MDC Brooklyn. Defendant Quay acted at all times under color of federal law. Defendant Quay is sued in his individual capacity.

21.     Defendant Tomas Rodriguez was a Special Investigative Services technician at MDC Brooklyn at all times relevant to this lawsuit. In his roles at MDC Brooklyn, he has responsibility for conducting investigations regarding potential misconduct at MDC Brooklyn. He was also temporarily assigned as a lieutenant at MDC Brooklyn on two occasions, including once while Plaintiff was incarcerated at MDC Brooklyn. In that role, he had responsibility for overseeing and supervising the staff and female inmates at MDC Brooklyn. Defendant Rodriguez acted at all times under color of federal law. Defendant Rodriguez is sued in his individual capacity.

22.     Defendant D'Anello Smith was a Senior Officer Specialist at MDC Brooklyn at all times relevant to this lawsuit. In his roles at MDC Brooklyn, he has responsibility for overseeing and supervising staff and female inmates at MDC Brooklyn. Defendant Smith acted at all times under color of federal law. Defendant Smith is sued in his individual capacity.

23.     Defendant Andy Cruz was a Deputy Captain at MDC Brooklyn at all relevant times. In that role, he had responsibility for overseeing and supervising Defendant Perez. Defendant Cruz acted at all times under color of federal law. Defendant Cruz is sued in his individual capacity.

24.     Defendant Jermaine Darden was a Deputy Captain at MDC Brooklyn at all relevant times. In that role, he had responsibility for overseeing and supervising Defendant Perez. Defendant Darden acted at all times under color of federal law. Defendant Darden is sued in his individual capacity.

25.     Defendant Officer Guapa, whose first name is unknown, was at all times a corrections official at MDC Brooklyn. Defendant Guapa acted at all times under color of federal law. Defendant Guapa is sued in his individual capacity.

26.     Defendants John/Jane Does 1-10 are officials who either had supervisory

authority and/or the opportunity to observe and intervene with respect to the acts of Defendant Perez and other staff and female inmates at MDC Brooklyn at the times relevant to this lawsuit, whose names are not known to Plaintiff at this time. John/Jane Does 1-10 acted at all times under color of federal law. John/Jane Does 1-10 are sued in their individual capacities.

27.    Plaintiff refers herein to Defendants Norwood, Ask-Carlson, Quay, Smith, Cruz, Darden, Guapa and John/Jane Does 1-10 collectively as the "Supervisory Defendants."

## JURY DEMAND

28.    Plaintiff hereby demands a trial by jury on all of her claims in this action.

## FACTUAL ALLEGATIONS

### *J.B.'s Incarceration at MDC Brooklyn*

29.    From July 2014 until September 2016, Plaintiff J.B. was an inmate at MDC Brooklyn. Plaintiff was housed at MDC Brooklyn in a unit on the south side of the sixth floor.

30.    At all times relevant thereto, J.B. was under the control, confinement, and direction of MDC officers and staff. She had no freedom or ability to refuse directions from guards or their superiors.

31.    J.B. received only one single visit during her three years at MDC.

32.    As a sentenced prisoner at MDC Brooklyn, J.B. was required to work.

33.    J.B. was sometimes ordered to clean offices on the second floor of the building, or the 3rd floor bathrooms. On those occasions, J.B. would be told while she was in her housing unit that a lieutenant required her to come to the second floor to do cleaning work. When a lieutenant told J.B. to clean the second floor, she had no choice as an inmate but to go. She would then be brought by a corrections officer from her housing unit to the second floor, either alone or with another female inmate.

34.      Once the corrections officer had brought J.B. to the second floor and brought her into the lieutenant's office, that officer would typically leave, and J.B. would be overseen by the lieutenant on duty, who had specifically sought out and ensured that J.B. specifically be directed to come clean that floor.

35.      The area on the second floor that Plaintiff was required to clean included the lieutenant's office and several other offices. The lieutenant's office was a small room with a desk, where the lieutenant on duty at the time would often sit. The cleaning supplies that J.B. had to use were kept in the lieutenant's office, near the lieutenant's desk.

36.      The desk in the lieutenant's office contained a computer that often showed the camera feeds from various parts of MDC Brooklyn, including the hall outside the lieutenant's office itself. In other words, watching those feeds allowed an MDC official to be aware if someone was about to approach the office. There was no camera to record what was happening inside the office.

37.      In addition, she was required to clean bathrooms on the 3rd Floor. There was also no cameras inside the bathrooms.

*Perez Preys Upon J.B. and Other Female Inmates*

38.      Defendant Perez, a lieutenant at MDC Brooklyn, also ordered J.B. to clean the third floor and bathrooms on several occasions while he was working. There were also no cameras inside the third floor bathrooms.

39.      In March of 2016, Defendant Perez ordered J.B. to come clean the lieutenant's office. Defendant Perez gave J.B. chicken wings, and then forced her to perform oral sex on him. J.B. initially refused, and then was forced by physical compulsion. J.B. is gay, and thus the forced act to perform oral on a man was of extra horrific nature.[1]

---

[1] The Plaintiff is outside the Statute of Limitations on the March 2016 rape claim, but it provides context and notice

40.     On September 2, 2016, Perez told J.B. to clean the 3rd Floor bathrooms. J.B., being a sentenced prisoner, had no choice but to comply with Perez's directives.

41.     Perez entered the bathroom behind J.B., and ordered her to take her shirt off. J.B. initially refused, but Perez forced her too. Perez then physically pushed J.B. onto her knees, and took out his penis. J.B. repeatedly said, "No, no no." J.B. repeatedly tried to get away.

42.     Defendant Perez inserted his penis into J.B.'s mouth, and forced his hands on the back of her head. Defendant Perez ejaculated into a napkin.

43.     Afterwards, Perez warned J.B. and the other inmate not to tell anyone about what had happened.

44.     J.B. tried to complain when she got back to her cell, but was sent to solitary confinement the next day.

45.     Guapa knew or should have known that Perez was targeting J.B. and the other inmate specifically to sexually assault them. Guapa should have intervened and/or reported Perez's unusual targeting conduct to prevent Perez from assaulting J.B. and other inmates.

46.     J.B. did not report these repeated sexual assaults to prison officials, because she did not want to be sent to the Special Housing Unit or lose her good time and have her incarceration extended, which she understood would happen based on the threats she received from the individual defendants. Moreover, she feared that no one would believe her; a sentenced prisoner who spoke little English, over Perez, a high-ranking officials at the prison. Moreover, she saw that other John/Jane Doe corrections officers observed how Perez had targeted her and ensured she would be

with respect to the September 2016 rape.

brought to them at specific times to be left alone, and that no John/Jane Doe corrections officers had taken any steps to investigate or otherwise intervene to prevent future assaults.

47. In a federal indictment that was unsealed on May 24, 2017, Perez was charged with sixteen counts Deprivation of Civil Rights, Aggravated Sexual Abuse, Sexual Abuse, and Sexual Abuse of a Ward based on his sexual abuse of J.B. and four other female inmates at MDC Brooklyn.

48. After a trial, a jury convicted Perez of all charges on May 14, 2018.

*Other Instances of Misconduct by Perez*

49. Prior to Perez sexually assaulting J.B., the United States and the Supervisory Defendants knew or should have known that there was a substantial risk that J.B.'s constitutional rights would be violated.

50. As a lieutenant, Perez had responsibility for (1) operations aspects of the Correctional Department and supervision of corrections officers assigned to given areas of the MDC; (2) providing day-to-day counseling of subordinates and resolving work-related problems; (3) evaluating the performance of subordinates; (4) maintaining order between both officers and inmates; and (5) handling disciplinary matters.

51. As a lieutenant, Perez was likewise responsible for conducting rounds at the MDC to identify and deter staff sexual abuse and sexual harassment. Defendant Perez began sexually assaulting female MDC Brooklyn inmates at least as far back as 2013. Sometime in 2013, Perez sexually assaulted a female inmate. As with the assaults of J.B. described above, that inmate was brought by another MDC Brooklyn officer to clean the second floor. Once she came to clean the Lieutenant's Office, Perez would assault her.

52. In or about January 2015, Perez sexually assaulted another female inmate in the prisoner changing area, an area known by prison officials to be without a camera.

53.     In or about February 2015, Perez sexually assaulted that same female inmate, this time in the Special Housing Unit, where he likewise believed and understood he could do so with impunity.

54.     An Incident Report dated February 9, 2016 – six months before Perez assaulted J.B. – described another female inmate's allegation that in January 2015, Perez had called her out of the visiting room to retrieve cleaning supplies and that, once they were in an isolated area, Perez groped her buttocks, pushed her up against the wall, rubbed his erect penis on her, and tried to kiss her. The incident report was signed by Defendant Quay.

55.     Even after this February 9, 2016 incident involving Defendant Perez, between approximately May and July 2016, Perez sexually assaulted another female inmate who had been brought to the second floor to clean. Again, Perez waited until the officer who had brought her, as well as the other inmate who had been cleaning, left, and told the inmate that he could monitor the surveillance footage to see if anyone was coming. Perez then proceeded to sexually assault her. In or about July 2016, Perez again sexually assaulted that same inmate.

56.     In or about September 2016, Perez sexually assaulted a different female inmate, again preying upon them while they were cleaning in the vicinity of the lieutenant's office.

57.     Upon information and belief, the United States and the Supervisory Defendants knew or should have known of these other instances of misconduct by = Perez, and of danger that Perez posed to J.B.

58.     The United States and Supervisory Defendants had ample opportunity to take steps or actions to prevent the assaults on J.B.

59.     In particular, Defendants Cruz and Darden, as direct supervisors of Perez, knew or should have known of these other instances of misconduct by Perez, and of the danger that

Perez posed to J.B.

60.    Cruz and Darden, as direct supervisors of Perez, also knew or should have known of the pattern of suspicious and improper behavior by Perez, including his practice of requesting specific female inmates to be brought to clean for them at specific/unusual times and being left alone when them in an unusual manner, and their practice of monitoring the camera feeds in the Lieutenant's Office to monitor when someone was coming to that office.

61.    Cruz and Darden had the authority and the opportunity to take steps or actions to prevent the assaults of J.B. by Perez, yet they failed to do so.

*History of Widespread Sexual Abuse at MDC Brooklyn*

62.    In addition to the known history of abuse by Perez specifically, the United States and the Supervisory Defendants likewise knew of or should have known of the substantial risk that J.B.'s constitutional rights would be violated based on the widespread history of sexual abuse at MDC Brooklyn.

63.    MDC Brooklyn has a long history of sexual abuse, including numerous known instances of prison officials sexually assaulting female inmates.

64.    MDC Brooklyn is overwhelmingly male: out of approximately 1,800 inmates, between a few dozen and approximately 150 are female, depending on the time period.

65.    According to a report by the *New York Times*, "To minimize contact between male and female inmates, the correctional staff tended to let women out of their dormitories for cleaning assignments at odd hours when men were locked in their units. That led to female inmates often being alone, or in small groups, with male officers during the jail's quietest hours, according to court records and interviews."

66.    Female inmates reported to the *New York Times* that, "During the overnight shift, an entire dormitory of women was sometimes supervised by only a single male correctional officer, who was sometimes in turn, supervised by a male lieutenant......"

67.    Another female inmate reported to the *New York Times* that "it was not uncommon for certain female inmates to get to share in the pizza or wings that correctional

workers often ordered for themselves from nearby restaurants" and that "the food was widely perceived as a reward for providing officers with sex."

68.    In or about November 2001, Lieutenant Randy Denjen raped a female inmate at MDC Brooklyn. As with the assaults of J.B., Denjen preyed upon the female inmate in an isolated area of the facility – in that case an isolation cell for inmates on suicide watch – where he knew no one would be around. Denjen pleaded guilty to causing a prisoner to engage in sexual contact by threatening and placing her in fear.

69.    A 2004 report by the Department of Justice's Office of Inspector General investigated and sustained allegations that male and female inmates had been transported in the same vehicle from MDC Brooklyn to court, and that a male inmate sexually assaulted a female inmate during such a trip as a result.

70.    In or about 2007, Correctional Counselor Theodore Raines raped and sexually assaulted two female inmates at MDC Brooklyn. Raines also preyed upon the women in an office, where he apparently believed he could do so with impunity. Raines threatened to send one of the inmates to solitary confinement if she reported him. He sexually assaulted the other inmate on approximately eight separate occasions. Raines pleaded guilty to Sexual Abuse of a Ward.

71.    The Department of Justice Office of the Inspector General's 2009 Report on Preventing Sexual Abuse of Inmates by Staff (the "2009 Report") found that "allegations of criminal sexual abuse and non-criminal sexual misconduct" of inmates by staff "more than doubled from FY 2001 through FY 2008" in the Bureau of Prisons overall, and that "[t]hese allegations increased at a faster rate than either the growth in the prisoner population or the number of BOP staff."

72.    The number of reported assaults was actually much higher, as the 2009 Report

found that "Some prisons were not reporting all allegations of staff sexually abusive behavior." For example, the 2009 Report found that, due to language in the BOP's guidance for the sexual abuse prevention program, "some BOP staff members may be confused about the need to report all allegations to the BOP's OIA and the OIG, even those that they believe are unfounded."

73.     The 2009 Report further found that "BOP officials at some prisons are not adequately considering all alternatives for safeguarding prisoners who reported being abused, which can result in fewer incidents of abuse being reported." In particular, "[i]n some locations, officials routinely placed alleged sexual abuse victims in a special housing unit or a local jail and then transferred them to another facility to protect them from further abuse." The report noted that this "segregation and transfer can have negative effects on the victims and can reduce their willingness to report abuse and to cooperate in investigations."

74.     Accordingly, the 2009 Report recommended "that the BOP consider alternatives to automatically isolating and transferring prisoners that allege sexual abuse and that the BOP develop procedures to ensure that alleged victims receive appropriate psychological and medical assessments."

75.     Relatedly, the 2009 Report found that "OIG and BOP investigators told us that investigating staff sexual abuse and sexual misconduct poses many challenges that make it difficult to conclude whether sexual abuse or misconduct occurred," including because "[v]ictims of sexual abuse often delay reporting incidents because they do not want to be isolated in the special housing unit and transferred to another prison." It further noted that "[i]nmate victims who report incidents often delay doing so until they have been transferred to another institution for some other reason."

76.     The 2009 Report also found substantial problems with the BOP's staff training and educational materials regarding sexual abuse.

77. In particular, the 2009 Report found that the BOP's training on "gender-specific issues," such as "'cross-gender" abuse of inmates by staff and issues specific to female inmates, were "incomplete and out of date."

78. The 2009 Report recommended that "BOP revise its self-study course, 'Managing Female Offenders,' to include instruction on the 2006 statutory changes that increased the penalties for sexual abuse of a ward and abusive sexual contact and that require staff members convicted of those crimes to register as sex offenders."

79. Moreover, the 2009 Report found that "[e]ducational materials provided to prisoners were also outdated and were subject to being misinterpreted to mean that prisoners themselves could be disciplined if they reported abuse committed by staff."

80. The 2009 Report recommended that the BOP "revise and update the 2005 Sexually Abusive Behavior Prevention and Intervention pamphlet to clarify that inmates will not be prosecuted or disciplined for being the victim of staff sexual abuse" and "to include a practical definition of staff-on-inmate sexual abuse and assault."

81. The 2009 Report found that "BOP officials have not established a goal of reducing the rate of staff-on-inmate sexual abuse." The report expressed the belief that "the establishment of measurable goals for reducing staff sexual abuse would signal to the BOP's managers that they will be held accountable for their efforts in preventing and detecting staff sexual abuse, providing victim services, thoroughly investigating and resolving allegations, and ensuring that staff members who sexually abuse inmates are dealt with appropriately."

82. Accordingly, the 2009 Report recommended that "BOP establish a national goal for reducing staff sexual abuse of federal inmates."

83. The 2009 Report found that the BOP had not applied sufficient oversight or operational reviews of its sexual abuse prevention program. The report found that "[r]egular

operational reviews could lead to prison improvements, such as posting surveillance cameras in areas known to be the frequent location of instances of sexual abuse to prevent and detect staff sexual abuse of inmates in those locations."

84.    Accordingly, the 2009 Report recommended that the "BOP direct prison officials to conduct operational reviews to assess the strengths and weaknesses of their sexual abuse prevention program."

85.    Part of Smith's job responsibilities includes assisting in the training of new officers at MDC Brooklyn.

86.    In July 2013, Nancy Gonzalez, a former Correctional Officer in the male unit at MDC Brooklyn, pleaded guilty to charges stemming from her engaging in a months-long sexual relationship with a male inmate, which resulted in the birth of a child. In a Sentencing Memorandum, Gonzalez's attorneys represented to a judge of this Court that, during her less than 24 months of employment at MDC Brooklyn, Gonzalez had been sexually involved with at least eight staff members at MDC Brooklyn, including two of the lieutenants there, who were her supervisors.

87.    In a news report in February 2013, Keishada Leftwich, a female guard in the men's facility at MDC Brooklyn described being "degraded and demoralized constantly on a daily basis" due to being a female at MDC Brooklyn, and said that she was on the verge of a nervous breakdown because of sexual harassment by her superior. Specifically, Leftwich alleged that a lieutenant at MDC Brooklyn bought a BlackBerry for her so she could receive sexual text messages from him, and she alleged that the lieutenant fondled her in the lieutenant's office in October 2010, activating the body alarm that correction officers wear to summon help.  Leftwich – a *corrections officer* – further stated, "There's so much pressure to give in to the abuse. . . I heard (officers) talking about Nancy[ Gonzalez]'s behind. The male COs (correction officers) tell the inmates about their relationships with staff and talk to inmates about 'hitting that.'"

Upon information and belief, Leftwich reported those allegations to the Bureau of Prisons and/or other federal agencies.

88.     In March 2015, the National Association of Women Judges ("NAWJ") Women in Prison Committee issued a report on the conditions in the women's unit of MDC Brooklyn. That report found that the conditions there "clearly fall below the ABA Standards on Treatment of Prisoners and the UN Standard Minimum Rules for the Treatment of Prisoners."

89.     In a follow-up report in June 2016, the NAWJ stated, "We concluded that in March 2015, conditions for women at MDC since December 2013 were unconscionable and they remain so in June 2016." The June 2016 report elaborated:

The absence of fresh, clean air, the complete absence of sunlight, and the absence of ANY outdoor time and activities are immediate issues which BOP has failed to address in any meaningful fashion. As noted in our prior report, these conditions violate the ABA Standards on Treatment of Prisoners and the UN Standard Minimum Rules for the Treatment of Prisoners. The few activities arranged for families do not address these major deficiencies. MDC Brooklyn is a temporary detention facility and is an inappropriate facility to house women or any person long term.

90.     In a September 2015 report, the Department of Justice Office of the Inspector General found that MDC Brooklyn's procedures regarding inmates submitting confidential complaints regarding sexual abuse were "unclear," and that, in at least one instance, a confidential complaint made by an inmate about sexual conduct between a staff member and an inmate, which was addressed to the Captain, was intercepted by the corrections officer about whom the complaint was made, and that the corrections officer proceeded to identify the inmate based on handwriting.

91.     According to the BOP Office of Internal Affairs, in each of the three years prior to J.B.'s incarceration at MDC Brooklyn (2012, 2013, and 2014), allegations of sexual abuse of inmates by staff were made at MDC Brooklyn at a substantially higher rate than in the Bureau of Prisons system overall. In 2014, on a per capita basis, there were more than twice as many

complaints of sexual abuse of inmates by staff at MDC Brooklyn than in the Bureau of Prisons system overall.

92.     According to an August 2017 *Washington Post* article, "While testifying at an earlier sexual abuse trial, the person responsible for overseeing the [PREA] standards at MDC did not appear to know that an officer could not legally engage in consensual sex with an inmate — that consent is not possible when one party literally holds the key to the other one's freedom."

93.     In another federal indictment that was unsealed on May 24, 2017, yet another MDC Brooklyn officer, Armando Moronta, was charged with Sexual Abuse of a Ward for engaging in unlawful sexual acts with four separate female inmates at MDC Brooklyn in or about May and June of 2016. In November 2017, Moronta pleaded guilty to all charges.

94.     Upon information and belief, a number of the other female inmates at MDC Brooklyn who were abused by prison officials were, like J.B., preyed upon because they were in particularly vulnerable circumstances, such as those who spoke little English, received few or no visits, had no upcoming court dates or meetings with attorneys, and/or were due to be sent to immigration custody upon their release from MDC Brooklyn.

95.     The United States and the Supervisory Defendants knew or should have known about this history of female inmates at MDC Brooklyn being sexually abused. Indeed, there were overwhelming indicators that an isolated inmate like J.B. would be subjected to abuse.

96.     The United States and the Supervisory Defendants knew or should have known of the substantial problems and shortcomings in the training that staff receive regarding sexual abuse, the system for reporting sexual abuse complaints, the treatment of female inmates who reported sexual abuse, education of inmates about and lack of real opportunities to report sexual abuse, the oversight of the sexual abuse prevention program at MDC Brooklyn and/or the actual violations of rules and procedures by Perez and/or propensity of each in assaulting

females or engaging in sexually inappropriate and abusive behavior.

97.     The United States and the Supervisory Defendants failed to take actions or implement procedures or policies that would have ensured J.B.'s safety and would have ensured that she not be sexually assaulted.

98.     Defendant Rodriguez knew or should have known that J.B. faced a substantial risk of being sexually assaulted by MDC Brooklyn officials, including Perez in particular.

99.     Defendant Rodriguez failed to take actions to ensure J.B.'s safety and ensure that she not be sexually assaulted.

100.    Defendant Guapa knew or should have known that J.B. faced a substantial risk of being sexually assaulted by MDC Brooklyn officials, including Perez in particular.

101.    Defendant Guapa failed to take actions to ensure J.B.'s safety and ensure that she not be sexually assaulted.

**FIRST CAUSE OF ACTION**
**(Negligence)**
**(Federal Tort Claims Act)**
**(Against Defendant United States)**

102.    Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

103.    The United States and its employees had a duty of care to J.B. while she was incarcerated at MDC Brooklyn.

104.    Employees of the United States knew or should have known that female prisoners at MDC Brooklyn, including J.B., were likely to be sexually assaulted.

105.    Employees of the United States knew or should have known that Defendant Perez were likely to engage in unlawful conduct that injured J.B.

106.    Employees of the United States acted negligently in hiring, training, retaining, and/or supervising Defendant Perez.

107.    Employees of the United States acted negligently in failing to take reasonable steps to prevent female prisoners at MDC Brooklyn, including J.B., from being sexually assaulted.

108.    Employees of the United States were acting within the scope of their employment when they engaged in these negligent acts and/or omissions.

109.    As a result of that negligence, J.B. was sexually assaulted by Defendant Perez, and suffered damages, including severe emotional harm and physical injuries.

**SECOND CAUSE OF ACTION**
**(Negligent Infliction of Emotional Distress)**
**(Federal Tort Claims Act)**
**(Against Defendant United States)**

110.    Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

111.    The United States and its employees had a duty of care to J.B. while she was incarcerated at MDC Brooklyn.

112.    Employees of the United States breached that duty by negligently failing to take reasonable and necessary steps to protect J.B. from being sexually assaulted, including by failing to intervene and prevent any assault and/or further assaults.

113.    That breach directly exposed J.B. to an unreasonable risk of bodily injury, caused her to fear her own safety, and resulted in her being sexually assaulted by Defendant and Perez.

114.    Employees of the United States were acting within the scope of their employment when they negligently inflicted emotional distress on J.B.

115.    As a result of Defendants' acts and omissions, J.B. suffered damages, including severe emotional harm and physical injuries.

**THIRD CAUSE OF ACTION**
**(Intentional Infliction of Emotional Distress)**
**(Federal Tort Claims Act)**
**(Against Defendant United States)**

116.    Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

117.    By sexually assaulting J.B., Defendant Perez engaged in extreme and outrageous conduct.

118.    Defendant Perez acted with the intent to cause, and/or disregard of a substantial probability of causing, severe emotional distress.

119.    As a direct result of the actions of Defendant Perez, J.B. suffered severe emotional distress.

120.    Defendant Perez were acting within the scope of their employment when they intentionally inflicted emotional distress on J.B.

121.    As a result of Defendants' acts and omissions, J.B. suffered damages, including severe emotional harm and physical injuries.

**FOURTH CAUSE OF ACTION**
**(Assault)**
**(Federal Tort Claims Act)**
**(Against Defendant United States)**

122.    Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

123.    Defendant Perez engaged in physical conduct that placed J.B. in imminent apprehension that they would harm her.

124.    Defendant Perez acted within the scope of their employment for the United States when they assaulted J.B.

125.    As a result of Defendants' actions, Plaintiff suffered damages, including severe emotional harm and physical injuries.

### FIFTH CAUSE OF ACTION
### (Battery)
### (Federal Tort Claims Act)
### (Against Defendant United States)

126.    Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

127.    By sexually assaulting J.B., Defendant Perez intentionally subjected her to bodily contact that was offensive in nature.

128.    Defendant Perez acted within the scope of their employment for the United States when they battered J.B.

129.    As a result of Defendants' actions, Plaintiff suffered damages, including severe emotional harm and physical injuries.

### SIXTH CAUSE OF ACTION
### (Cruel and Unusual Punishment)
### (Eighth Amendment / *Bivens*)
### (Against Defendant Perez, Defendant Rodriguez, Defendant Guapa, and the Supervisory Defendants)

130.    Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

131.    By sexually assaulting J.B., Defendant and Perez violated her right to be free from cruel and unusual punishment.

132.    The Supervisory Defendants knew or should have known that there was a high degree of risk that female inmates, and J.B. in particular, would be sexually assaulted by staff at MDC Brooklyn, and by Defendant Perez in particular.

133.    Defendant Rodriguez knew or should have known that there was a high degree of

risk that J.B. would be sexually assaulted by staff at MDC Brooklyn, and by Defendant

Perez in particular.

134.    Defendant Guapa knew or should have known that there was a high degree of risk

that J.B. would be sexually assaulted by staff at MDC Brooklyn, and by Defendant and Perez in

particular.

135.    The Supervisory Defendants, Defendant Rodriguez, and Defendant Guapa

nonetheless acted with a deliberate and/or reckless disregard of the risk that J.B.'s Eighth

Amendment rights would be violated.

136.    At all relevant times, Defendants Perez, Rodriguez, Guapa, and the

Supervisory Defendants acted under color of federal law.

137.    As a result of Defendants' acts and/or omissions, J.B. suffered damages,

including severe emotional harm and physical injuries.

138.    Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth

herein.

**SEVENTH CAUSE OF ACTION**
**(Assault)**
**(New York Common Law)**
**(Against Defendant Perez)**

139.    Defendant Perez engaged in physical conduct that placed J.B. in

imminent apprehension that they would harm her.

140.    Defendant Perez were acting outside the scope of their employment

for the United States when they assaulted J.B.

141.    As a result of Defendants' actions, Plaintiff suffered damages, including severe

emotional harm and physical injuries.

**EIGHTH CAUSE OF ACTION**
**(Battery)**
**(New York Common Law)**
**(Against Defendant Perez)**

142.    Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth

herein.

143.    By sexually assaulting J.B., Defendant and Perez intentionally

subjected her to bodily contact that was offensive in nature.

144.    Defendant Perez were acting outside the scope of their employment

for the United States when they battered J.B.

145.    As a result of Defendants' actions, Plaintiff suffered damages, including severe

emotional harm and physical injuries.

**NINTH CAUSE OF ACTION**
**(Negligent Infliction of Emotional Distress)**
**(New York Common Law)**
**(Against Defendant Perez)**

146.    Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth

herein.

147.    As lieutenants at MDC Brooklyn, Defendant and Perez had a duty of care to

J.B. while she was incarcerated at that facility.

148.    By sexually assaulting J.B., Defendant and Perez breached that duty of

care.

149.    That breach directly exposed J.B. to an unreasonable risk of bodily injury, caused

her to fear her own safety, and resulted in her suffering emotional and physical injuries.

150.    Defendant Perez were acting outside the scope of their employment for the

United States when they negligently inflicted emotional distress on J.B.

151.    As a result of Defendants' acts and omissions, J.B. suffered damages, including

severe emotional harm and physical injuries.

## TENTH CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress)
### (New York Common Law)
### (Against Defendant Perez)

152.    Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

153.    By sexually assaulting J.B., Defendant and Perez engaged in extreme and outrageous conduct.

154.    In doing so, Defendant Perez acted with the intent to cause, and/or disregard of a substantial probability of causing, severe emotional distress.

155.    As a direct result of the actions of Defendant and Perez, J.B. suffered severe emotional distress.

156.    Defendant Perez were acting outside the scope of their employment for the United States when they intentionally inflicted emotional distress on J.B.

157.    As a result of Defendants' acts and omissions, J.B. suffered damages, including severe emotional harm and physical injuries.

WHEREFORE, Plaintiff respectfully requests that judgment be entered against Defendants as follows:

a.   Awarding compensatory damages for all emotional distress, humiliation, pain and suffering, physical injury, and other harm, in an amount to be determined at trial;

b.   Awarding punitive damages in an amount to be determined at trial;

c.   Awarding pre- and post-judgment interest, attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

d.   Awarding such other and further relief as this Court may deem just and proper.

Dated: New York, New York
       July 8, 2019

                                        CAITLIN ROBIN & ASSOCIATES PLLC

                                        By: _____

                                        Caitlin Robin & Associates PLLC
                                        30 Broad Street, Suite 702
                                        New York, New York 10007
                                        (646)-524-6026
                                        Caitlin@robinandassociates.com
                                        CR1852
                                        *Attorneys for Plaintiff*